Alexandra KAKIDES

v.

**KING DAVIS AGENCY, INC., et al.**

No. CIV.A.01–CV–12031RGS.

United States District Court,
D. Massachusetts.

Sept. 18, 2003.

---

Paul J. Klehm, Law Offices of James B. Krasnoo, James B. Krasnoo, Andover, MA, for Alexandra Kakides, Plaintiff.

Andrew K. Goldstein, Epstein, Becker & Green, PC, Boston, MA, for King Davis Agency, Defendant.

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

STEARNS, District Judge.

On November 21, 2001, Alexandra Kakides, a then seventy-seven year old real estate broker, filed this Complaint against the real estate agency where she had worked for twenty-five years, King Davis Agency, Inc., the agency's owner, Kingsbury Davis (Davis), two officers of the company (Francis Cleary and Rodger Chadwick), and various other companies that had over time affiliated themselves with King Davis Agency.[1] Kakides attrib-

---

1. Kakides essentially admits in her papers that she has sued more defendants than necessary in an "abundance of caution," because of uncertainty about the name of the entity that eventually acquired King Davis Agency. She argues that discovery will cure this defect. While the relationships between the various entities are not entirely clear, it seems that in 1997, King Davis Agency became King Davis Partners, LLC. In 1999, it merged with Coldwell Banker Hunneman to form Coldwell Banker Hunneman King Davis. It addition to the three King Davis corporations named above, Kakides has also sued the companies that made up Coldwell Banker Hunneman before its merger with King Davis (Hunne-

utes repeated acts of sexual discrimination to Davis since at least 1990. Her sexual harassment claims include allegations of: (1) inappropriate sexual conduct by Davis, including physical touching; (2) a hostile work environment; (3) pay discrimination; and (4) retaliation. Kakides alleges claims under Title VII of the Equal Employment Opportunities Act, violations of the Massachusetts Employment Discrimination Act, G.L. c. 151B, breach of contract, breach of the covenant of good faith and fair dealing, promissory estoppel, quantum meruit, a violation of the Massachusetts Civil Rights Act, G.L. c. 12 § 11H and I, assault and battery, and intentional and negligent infliction of emotion distress. Kakides' claims are apparently alleged against each defendant.

On August 15, 2002, defendants filed a motion to dismiss, or in the alternative for summary judgment, arguing that Kakides' discrimination claims must be dismissed because she worked as an independent contractor from December 1, 1999, and it is settled law that Title VII and Chapter 151B do not apply to independent contractors. *Alberty–Velez v. Corporacion De Puerto Rico Para La Difusion Publica,* 242 F.3d 418, 421 (1st Cir.2001). Kakides maintains that she is a covered employee, and on the issue of her employment status the case was joined. At Kakides' request, after the defendants filed for summary judgment, the court extended the schedule to permit related discovery and then accepted supplemental briefs. On May 8, 2003, the court heard oral argument on defendants' motion.

### BACKGROUND

The facts in the light most favorable to Kakides are as follows.[2] In 1960, Kakides

acquired a real estate broker's license and took a job with the King Davis Agency. In 1976, Kakides was asked to become vice-president of King Davis Agency. She accepted the offer and entered into a written employment contract. In 1995, Kakides complained to Davis that she was being undercompensated because she was a woman. On January 19, 1995, Davis wrote to Kakides stating:

> [w]hen you joined The King Davis Agency in 1977 you were considered an "employee" of the corporation, and were covered under certain benefits .... On January 1, 1990, all salespeople were reclassified as independent contractors. This meant they would be liable for paying their own federal income tax payments; social security and medicare taxes; ... and no longer would be covered under the Agency unemployment, workmen's compensation and disability insurances. They would also have to pay for their own MLS books. Since they would incur additional expenses ... their commission schedule was revised to reflect a higher payment to them on co-broke sales and listings.

> At this time, a select few individuals (corporate officers) were given the option of remaining "employees" of the Agency and thus retain their ... benefits programs. In return for receiving these benefits, these people would remain under our "already existing" co-broke commission schedule.... You elected to remain an employee of the Corporation as indicated in your letter of December 27, 1989.... Thus, you elected to remain under this "already

man & Company, Hunneman Real Estate Company, and Coldwell Banker Real Estate Corporation).

2. The facts are distilled from the Complaint and the parties' statements of disputed and undisputed facts.

existing" co-broke commission schedule....

I want this issue put to rest once and for all, and I do not want you to stress me out as a result of your forgetting what the arrangements are.... Unless I hear to the contrary we shall consider this matter closed.

On December 21, 1995, Kakides wrote Davis stating:

Effective January 1, 1996, I request my payment status be put forth as an independent contractor. My vice president benefits will remain the same (insurance, MLS books, etc.).

On July 9, 1996, Davis wrote to Kakides confirming that while Kakides had opted to be compensated as an independent contractor for her brokerage business, she would continue as an employee of King Davis Agency for purposes of "management income." Consequently, while Kakides' compensation was calculated on the same basis as that of the agency's independent contractors, she continued to receive fringe benefits in her role as a company vice-president. On July 16, 1996, Kakides alleges that Davis struck her on her buttocks.

In 1997, King Davis Agency, Inc., became King Davis Partners, LLC, and Kakides' employment contract was assigned to the new entity. On October 20, 1997, Davis joked that "[w]hen the police take Allie [Kakides] out, they will take her out the back door." In 1997, Kakides complained about a diminution in her role as a King Davis vice-president. On January 8, 1998, Davis asked Kakides if she thought his pending surgery would "help my sex?" On February 28, 1998, Davis made a derogatory remark while Kakides was bending over.

In February of 1999, King Davis Agency Partners, LLC, issued a press release announcing Kakides' induction as a profit sharing "Member Owner" of King Davis. In 1999, King Davis merged with Coldwell Banker Hunneman to form Coldwell Banker Hunneman King Davis (Hunneman). On December 1, 1999, Kakides entered into an "Independent Contractor Agreement" with Hunneman. The Agreement stated that the "Associate's relationship to the Company is that of an independent contractor engaged in an independent business." Thereafter, the payment of fringe benefits to Kakides ceased. She received commission payments only upon the successful completion of sales. She received an IRS Form 1099 at the end of each year reporting her commission payments. Taxes were no longer withheld from her gross income. Kakides paid her own licensing and listing fees, and scheduled her own sales calls. Hunneman provided Kakides with a desk and office supplies. It also required that she attend weekly marketing meetings, regular training seminars, and to perform periodic "floor duty" answering the office telephones.

In early 2000, Davis gave Kakides an advertisement from a hotel with the notation "Love KD, PS We can have some fun!" In August of 2000, Davis again struck Kakides on the buttocks. On November 9, 2000, while looking through the trunk of Kakides' car, Davis asked, "Whose panties are these?" On a date that Kakides cannot recall, Kakides alleges that Davis gave her a cartoon of a woman with semi-exposed breasts inscribed with the notation, "Allie, I hardly recognize you." On another unspecified occasion, Kakides alleges that Davis remarked, "Look, Steve is in Allie's drawers" (alluding to a co-worker helping Kakides with an uncooperative desk drawer).

On November 13, 2000, Kakides complained to Davis about the alleged sexual

harassment. She alleges that she was thereafter ostracized by Davis and her co-workers and forced to resign. She filed a charge with the MCAD on December 7, 2000, and this Complaint on November 21, 2001.

### DISCUSSION

■ Defendants argue that Kakides was an independent contractor from at least December 1, 1999, when she signed Hunneman's "Independent Contractor Agreement." Defendants also argue that any allegations of sexual harassment that pre-date December 1, 1999, are barred by the statute of limitations.

Kakides, while acknowledging the Independent Contractor Agreement, argues that she was hired as an employee and, despite the Agreement, remained an employee in substance if not name throughout her tenure with King Davis. Kakides argues that the proper test is not based on labels, but on the degree of control the employer exercises over the putative employee.

Title VII defines "employee" somewhat obscurely as "any individual employed by an employer." 42 U.S.C. § 2000e(f). In *Clackamas Gastroenterology Associates v. Wells*, 538 U.S. ——, 123 S.Ct. 1673, 155 L.Ed.2d 615 (2003), the Supreme Court was asked to resolve a circuit conflict as to the appropriate test to be applied in determining whether the director-shareholder physicians of a professional corporation should be deemed employees under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, which like Title VII, defines an employee as "an individual employed by an employer." 42 U.S.C. § 12111(4). The *Clackamas* Court began by reviewing the test it had previously developed when the term "employee" as used in a federal statute is essentially undefined.

"We have often been asked to construe the meaning of 'employee' where the statute containing the term does not helpfully define it." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992). The definition of the term in the ADA simply states that an "employee" is "an individual employed by an employer." 42 U.S.C. § 12111(4). That surely qualifies as a mere "nominal definition" that is "completely circular and explains nothing." *Darden*, 503 U.S. at 323, 112 S.Ct. 1344, 117 L.Ed.2d 581. As we explained in *Darden*, our cases construing similar language give us guidance on how best to fill the gap in the statutory text.

In *Darden* we were faced with the question whether an insurance salesman was an independent contractor or an "employee" covered by the Employee Retirement Income Security Act of 1974 (ERISA). Because ERISA's definition of "employee" was "completely circular," 503 U.S. at 323, 112 S.Ct. 1344, 117 L.Ed.2d 581, we followed the same general approach that we had previously used in deciding whether a sculptor was an "employee" within the meaning of the Copyright Act of 1976, see *Community for Creative Non–Violence v. Reid*, 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989), and we adopted a common-law test for determining who qualifies as an "employee" under ERISA. Quoting *Reid*, 490 U.S. at 739–740, 109 S.Ct. 2166, 104 L.Ed.2d 811, we explained that "'when Congress has used the term 'employee' without defining it, we have concluded that Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine.'" *Darden*, 503 U.S. at 322–323, 112 S.Ct. 1344, 117 L.Ed.2d 581.

*Id.* at 1677–1678.[3]

As explained in *Darden,* under the agency doctrine:

> [W]e consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Darden,* 503 U.S. at 323–324, 112 S.Ct. 1344, quoting *Reid,* 490 U.S. at 751–752, 109 S.Ct. 2166, and citing Restatement (Second) of Agency § 220(2) (1958).

Kakides contends that she falls on the employee side of the *Darden* test because she was hired as an employee and performed the same job for twenty-five years for essentially the same employer. Despite the December 1, 1999 Independent Contractor Agreement, Kakides contends that under Massachusetts law she remained functionally a "servant," because Hunneman, as the successor to King Davis, controlled her work, supplied office materials, and provided a place of employment.[4]

The undisputed facts, however, establish otherwise. After December 1, 1999, Kakides was no longer a vice-president of Hunneman, and no longer receiving a fixed compensation.[5] Instead, she was working as a broker whose pay consisted entirely of sales commissions. Her commission payments were disbursed without withholding, consistent with the tax rules governing independent contractors. Moreover, she no longer received any of the fringe benefits that she had received as a tenured employee, such as health insurance, work-

---

**3.** While *Darden* involved the ADA and not Title VII, it is clear from *Clackamas* that Supreme Court decisions involving the definition of an "employee" under one federal discrimination statute apply with equal force to all other discrimination statutes that fail to define "employee."

> The disagreement in the Circuits is not confined to the particulars of the ADA. For example, the Seventh Circuit's decision in *EEOC v. Dowd & Dowd, Ltd.,* 736 F.2d 1177 (1984), concerned Title VII, and the Second Circuit's opinion in *Hyland v. New Haven Radiology Associates, P. C.,* 794 F.2d 793 (1986), involved the ADEA. *See also Devine v. Stone, Leyton & Gershman, P. C.,* 100 F.3d 78 (C.A.8 1996) (Title VII case).

*Id.* at 1677 n. 3.

**4.** The Massachusetts common-law test of the master-servant relationship is based on essentially the same factors as those listed in *Darden.*

> In the employment context, a master-servant relationship is determined by a number of factors, including the right of the employer to control the details of the work done by the employee, the method of payment, the skill required in the particular occupation, whether the employer supplies the tools, instrumentalities and place of work, as well as the parties' own belief as to whether they are creating a master-servant relationship.

*Chase v. Independent Practice Association,* 31 Mass.App.Ct. 661, 665, 583 N.E.2d 251 (1991).

**5.** Kakides submits deposition testimony from three other brokers who worked at Hunneman attempting to dispute this fact. According to these witnesses, Kakides was sometimes referred to as a vice-president. But, the evidence also states that the title was "honorary" as "she didn't have any official duties assigned with that title." Deposition of Carolyn Blood, at 27–28.

ers' compensation, unemployment insurance, and vacation pay. While Hunneman provided her with a workplace, she was required to pay her own licensure and MLS fees. She developed her sales leads independently and set her own hours, working as much or as little as she felt necessary to complete a sale.

Kakides argues that Hunneman ultimately controlled the terms of her employment because she was required to attend weekly marketing meetings and periodic training seminars and to perform floor duty during office hours to accommodate walk-in business.[6] The court is persuaded by the reasoning of two strikingly similar cases, *Krijn v. Pogue Simone Real Estate Co.*, 752 F.Supp. 102 (S.D.N.Y.1990), *aff'd* without opinion, 930 F.2d 910 (2nd Cir. 1991), and *Stetka v. Hunt Real Estate Corp.*, 859 F.Supp. 661 (W.D.N.Y.1994), that these factors alone are insufficient to transform Kakides' status as an independent contractor into that of an employee.

In *Krijn*, the plaintiff broker brought suit under Title VII against the real estate agency where she worked alleging wrongful discharge. The agency, Pogue Simone Real Estate Co. (Pogue Simone) sought dismissal of Krijn's Title VII claims, arguing (as here) that as an independent contractor, she was not covered by Title VII. The district court summarized the evidence as follows:

> Pogue Simone contends that because it retains minimal control over its salespeople, including Krijn, they are subcontractors under common law and as such are not entitled to Title VII relief. I agree. Indeed, Pogue Simone neither withholds taxes from nor pays benefits to its salespeople. Salespeople are not expected to keep regular office hours. Even if weekly meetings call for mandatory attendance, as Krijn avers, this assertion is not enough to withstand dismissal, considering the remainder of the record which shows that Pogue Simone maintains little other control over its sales force.

> Admittedly, salespeople associated with Pogue Simone are benefited by its real estate resources, guides, listings, and office space in which to conduct independent sales. In return, commissions from sales are paid Pogue Simone. Pogue Simone also expects periodic attendance by its salespeople in its offices. However, these practices do not constitute sufficient control over the "details" and "means" by which the work is to be performed as to equal the control that an employer asserts over its employees. *See In re Wilson Sullivan Co.*, 289 N.Y. 110, 44 N.E.2d 387 (1942) (licensed real estate salesperson is an independent contractor and not an employee under New York law.)

> Krijn was paid solely on a commission basis, her time was totally unstructured, and Browne [her immediate supervisor] was not shown to exercise any meaningful control over Krijn's hours or over the day-to-day details of her work. Pogue Simone's and Browne's interests lie only in the end product, namely, sales. Nowhere in the record is it shown that Pogue Simone exhibited such control over Krijn as to be deemed her "employer" sufficient to defeat the presumption that Krijn was no more than an independent contractor. Finally, that Krijn claims to have been under Pogue Simone's control because it retained

---

**6.** Kakides makes note of the fact that in February of 1997, King Davis Agency Partners, LLC, announced in a press release that Kakides was "now a Member Owner" of King Davis. Kakides, however, offers no evidence that any material change in the terms of her employment resulted.

Krijn's license to sell during her tenure with Pogue Simone is of no moment. Krijn was already licensed by the time she sought to be a sales person associated with Pogue Simone; she was responsible for the costs of obtaining and maintaining her license to sell real estate. As such, Krijn is procedurally barred from asserting claims as arising under Title VII.

*Id.* at 104–105. Similarly, the court in *Stetka* held:

that, under the common law agency test as set forth in *Darden, Reid,* and *Frankel,* Plaintiff is an independent contractor, and therefore, may not bring an action against Defendant under Title VII or the New York Human Rights Law. Despite the fact that she was given office space, that she was scheduled for floor time by the Hunt manager, and the requirement that Plaintiff attend sales meetings and spend two to four hours a week in the Hunt office, Plaintiff's time was generally unstructured. Plaintiff set up her own meetings, brought in her own business, developed her own leads, and marketed herself as an independent agent. Defendant did not exercise day-to-day control over Plaintiff such as an employer would exercise over an employee. Rather, Plaintiff only appeared at the Hunt office on her own schedule. An analysis of the facts in this case leads to the conclusion that Plaintiff's position with Hunt Real Estate was that of an independent contractor.

*Id.,* at 667. Consistent with the facts of these decisions, the court finds that Kakides worked as an independent contractor for Hunneman from at least December 1, 1999, and therefore, was not covered by Title VII with respect to claims based on conduct by Hunneman or its employees after that date.

Defendants also argue persuasively that Kakides' claims based on pre-December 1, 1999 conduct must also be dismissed. Kakides filed her charge of discrimination with the MCAD on December 7, 2000. Title VII requires a claim to be filed with the EEOC within 180 days of the last alleged act of discrimination, or 300 days where the initial filing is with the MCAD. 42 U.S.C. § 2000e–5(e)(1). *See EEOC v. Green,* 76 F.3d 19, 20 (1st Cir. 1996). Consequently, Kakides' claims under Title VII will be *DISMISSED.* Kakides' remaining state law claims will be *REMANDED* to the Supreme Court. *See Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988).

### *ORDER*

For the foregoing reasons, the defendants' motion for summary judgment is *ALLOWED* as to Kakides' Title VII claims. The case is *DISMISSED* and the remaining state law claims are hereby *REMANDED.*

SO ORDERED.