COMPUTER ASSOCIATES
INT'L, INC., Plaintiff,

v.

STATE STREET BANK AND
TRUST CO., Defendant.

Civ. A. No. 91–12829–K.

United States District Court,
D. Massachusetts.

April 9, 1992.

Bernard Joseph Bonn, III, Timothy Charles Blank, Dechert Price & Rhoads, Boston, Mass., for plaintiff.

John C. Bartenstein, Eric Jaeger, William L. Patton, Ropes & Gray, Boston, Mass., for defendant.

## MEMORANDUM AND ORDER

KEETON, District Judge.

In this action for breach of contract and copyright infringement, defendant State Street Bank and Trust Co. ("State Street" or the "Bank") has moved for a preliminary injunction enjoining plaintiff Computer Associates International, Inc. ("Computer Associates") from terminating maintenance support for Computer Associates' software products installed on State Street's computer. A temporary restraining order has been in place since November 22, 1991. For the reasons that follow, I now grant defendant's motion for preliminary injunction.

### I. Background Facts

For purposes of this Memorandum and Order, I adopt as part of my findings the nonunderlined and nonbracketed portions of the parties' respective proposed findings of fact (Docket Nos. 40 and 54). Other findings are contained throughout this Memorandum. I state briefly sufficient

background information to provide context for the discussion that follows.

Plaintiff Computer Associates is in the business of developing, marketing, and supporting computer software programs. Among the programs that are proprietary to Computer Associates is DATACOM/DB ("Datacom"). Datacom is a software program that organizes, stores, and retrieves data.

Defendant State Street is a bank that acts as custodian of hundreds of billions of dollars in assets for a large number of mutual funds. State Street performs, among other things, an important record-keeping function for its mutual fund customers. In order to do so, State Street uses programs it leases from Computer Associates, including the Datacom program.

State Street first acquired rights to use Datacom from Insyte Datacom Corporation in 1977. In 1979, Applied Data Research, Inc. ("ADR") acquired all rights to Datacom owned by Insyte. Thereafter, State Street entered into an agreement ("Basic Agreement") with ADR for the use of Datacom and other ADR programs.

In 1983 and '84, ADR and State Street entered into discussions to extend the permissible uses State Street may make of Datacom and other programs. The spur for these discussions was the desire of one of the Bank's customers, GTE Shareholders Services, Inc. ("GTE"), to use the ADR software. GTE was unique among the Bank's customers in at least two respects: first, GTE was a tenant of the building housing the State Street computer system; and, second, GTE used State Street's computer for its own programming needs. In January 1985, an agreement was executed between State Street and ADR under which GTE was allowed to use the ADR software in exchange for a royalty payment equivalent to 15% of the royalty fee State Street pays. State Street had a choice to obtain a GTE-specific license amendment or a more general timesharing amendment from ADR, and chose the latter. GTE's use of Datacom continues to be materially different in kind from that of any other Bank customer. Only GTE (as well as State Street) has direct access to Datacom on the State Street mainframe computer to support its own applications programs.

In the early 1980's, State Street introduced a new service. That service was first made widely available to customers in 1985 under the name Horizon. However, the service that later came to be called "Horizon" was principally developed by 1983 or '84, and portions of that service were available under the name MMARK in 1983 to certain Bank customers. The Horizon service utilizes an application program written by State Street. The application program is also called HORIZON ("Horizon"). Although it could be rewritten to use a different data management tool, Horizon relies at present on the data management capabilities of Datacom. The Horizon program cannot work without using Datacom.

Horizon allows off-site Bank customers on-line, real-time access to mutual fund information. For the first time, in 1985 it became possible for a Bank customer subscribing to Horizon to download and upload information directly, bypassing the services of State Street personnel.

In 1988, Computer Associates acquired ADR and its proprietary rights in Datacom and other ADR programs.

## II. Preliminary Injunction Standard

A preliminary injunction may be granted if State Street satisfies four criteria: (1) a likelihood of success on the merits; (2) irreparable injury if the injunction is not allowed; (3) such injury outweighs any harm that granting injunctive relief may cause to the non-moving party; and (4) an injunction is in the public interest. *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 5 (1st Cir.1991).

I address briefly the last three elements of the standard and then turn at length to State Street's likelihood of success on the merits.

### A.

■ I find that State Street is likely to suffer irreparable injury if the injunction is

not allowed. I make that finding on the basis of the following underlying findings. First, in the absence of maintenance support, the functionality of the Datacom program (and others) is likely to erode. Second, even if the Datacom program were to remain functional, the Bank and its customers could not continue to rely on the availability of that program. As a result, the Bank's business and business reputation would be substantially harmed.

### B.

I also find that the injury the Bank would suffer if the injunction is not granted far outweighs any injury Computer Associates would suffer if an injunction is implemented. Computer Associates' principal harm is the ongoing injury, if any, resulting from State Street's alleged breach of contract. That harm can be compensated by monetary damages, and the risk of that harm can be precluded by requiring State Street to post reasonable security.

Computer Associates argues that the injury it suffers is the irreparable injury of copyright infringement. It cites cases that hold that exceeding the scope of a license agreement is infringement, as well as cases holding that copyright infringement is a presumptively irreparable injury. Moreover, Computer Associates cites cases that hold that a copyright infringer cannot claim irreparable injury, even from the total destruction of its business, if the business is predicated on a forbidden infringing act. All of those cases are distinguishable on two grounds.

First, the injunction sought is an injunction to protect defendant against termination of maintenance support, not an injunction to protect plaintiff against copyright infringement (or to protect defendant against liability for damages). Therefore, the irreparable injury Computer Associates fears will not result from granting an injunction, nor would it be prevented by denying the injunction sought. Denying the motion will not terminate infringement, if it is occurring, in any event.

Second, infringement results only from the unauthorized copying of copyrighted material. 17 U.S.C. § 106. A use of an authorized copy of copyrighted subject matter ordinarily is not infringing. For example, a person who owns an object in which another owns a copyright may nevertheless display the object. *See Community for Creative Non–Violence v. Reid*, 846 F.2d 1485, 1498 (D.C.Cir.1988), *aff'd*, 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989); 17 U.S.C. § 109. I find that no copies are being made by State Street of the copyrighted programs, except such ephemeral copies as are necessary to the operation of the program on the Bank's computer. *See* 17 U.S.C. § 117(1). That use is permitted by the copyright laws. *Id.* Computer Associates' argument that State Street is infringing its copyright depends on Computer Associates' ability first to demonstrate that the copies being made and used by State Street are not authorized under the license. It is undisputed that State Street's possession of its copies of Computer Associates' software is lawful, unless State Street is found for reasons such as Computer Associates asserts here to have broken its agreement. Therefore, applicable limitations on State Street's use of the programs, if any, must be derived initially from the license agreements, not copyright law.

Computer Associates also claims that injury may result from a loss of trade secrets and proprietary information. However, I find that State Street's customers do not have access either to the source code for Computer Associates' programs or access to the object code (in the sense of access to viewing, rather than merely indirectly "using" the object code by using the program). Moreover, I find that there is no risk from State Street's present use of the programs that copies of Computer Associates' programs will reach third parties on any fixed medium.

### C.

Finally, I find that an injunction is in the public interest. State Street manages hundreds of billions of dollars of assets. It is in the public interest that stabili-

ty be maintained in the supervision of those assets. Of course, there is a public interest in ensuring that contracts are honored and copyrights respected; however, that interest, if implicated in this case, will be satisfied at the conclusion of this litigation. There is no strong public interest in facilitating the immediate termination of maintenance support, particularly since State Street is in compliance with that portion of its contracts with Computer Associates that calls for the payment of fees for support.

## III. The Merits

There are two contract provisions at issue in this case; more precisely, a use provision in the Basic Agreement (Ex. 2 to Docket No. 60) between the parties and a use provision in a later amendment ("Timesharing Amendment") (Ex. 3 to Docket No. 60) to the Basic Agreement. I discuss the contract provisions in reverse chronological order, according to the time of implementation.

## A.

The Timesharing Amendment provides, in part:

Notwithstanding provisions of the Security and Use of Products section of the Basic Agreement to the contrary, Customer may use the Product(s) identified below [including Datacom] to provide service to third parties (hereinafter "Client") in a timesharing, service bureau and/or remote batch environment.

The Timesharing Amendment further calls for an annual royalty payment of one percent of the then-current license fee paid by State Street to Computer Associates for each Client to whom services are provided. A fifteen percent minimum royalty payment is due even if the Bank has only one customer.

I have received significant proffers of parol evidence on the meaning of the contract terms "timesharing" and "service bureau," and have reserved ruling on Computer Associates' objections to the admission of such evidence. I now conclude that the clause in which the terms "timeshar-ing" and "service bureau" appears is ambiguous, and that I should consider the parol evidence. I reach this conclusion after carefully considering the "unambiguous definitions" proposed by plaintiff.

As a definition of "timesharing," plaintiff proposes, "Timesharing is a technique permitting many users simultaneous access to a central computer through remote terminals." *The American Heritage Dictionary* 1271 (2d college ed. 1985). Alternatively, defendant proposes, "Timesharing exists where the customer has a terminal at its own location for data input and output; the terminal is connected via a communications link to the bank's computer, which effectively processes the data as soon as it is input and returns to the customer an immediate result." Finally, plaintiff proposes that "timesharing" may be defined as defendant has used that term internally: "In a 'timesharing' system, each user has access to the system through a terminal device. Instead of submitting jobs which are scheduled for later execution, the user enters commands which are processed immediately." Plaintiff argues, and I find, that the use being made by State Street and its customers satisfies all of these definitions.

The difficulty is that it is apparent (and plaintiff does not contend otherwise) that the Timesharing Amendment was not meant to apply to Automatic Teller Machines (ATMs). Yet, ATMs also satisfy all of these definitions. Thus, I am forced to conclude that the term "timesharing," even if unambiguous on its face, is used ambiguously in this contract because the contract as a whole manifests an intent that "timesharing" apply to some uses that fall within the seemingly unambiguous definition (GTE's use of the programs to run its own applications) but not others (ATMs).

Similarly, plaintiff has proposed the following definitions of "service bureau." First, "a company holding itself out to process its customer's data." Second, an "organization that provides data processing services for other individuals or organizations." These proposed definitions are even more problematic. To realize this,

one need not even consider the advent of ATMs. State Street has been performing data processing services for decades, computer-aided data-processing services since the 1970's, and computer-aided data-processing services using Datacom since 1979. It is readily apparent that the term "service bureau" does not extend to all that any of the proposed definitions "unambiguously" encompasses. It is necessary, therefore, to consider the manifested intent of the parties in drafting a contractual clause in which this term appears. Determination of manifested intent is made difficult by the fact that the parties adopted a form contract ordinarily used for a different purpose. I conclude that I must consider parol evidence in search of a meaning that the parties mutually manifested to one another by communications outside the written agreement.

I do not consider the meaning of the term "remote batch processing" because I conclude that it is not at issue in this case. There does not appear to be a contention that Bank customers are performing batch processing; rather, they are performing online real-time operations. That the *Bank* performs batch processing *for* its customers was clearly contemplated by the parties at all times.

■ I now examine the parol evidence to determine whether the parties manifested an intent that the terms of the Timesharing Amendment apply to the uses of Datacom currently being made by the Bank's customers. The Bank claims that the parties manifested a mutual understanding that the Timesharing Amendment was entered into for the sole purpose of allowing GTE to use the ADR programs. I find that this was their sole immediate purpose; they did not identify to each other another customer, and neither of them had any customer or potential customer in contemplation at that time. Computer Associates claims that the inception of the Bank's sales pitch for its Horizon service occurred not coincidentally shortly after the Timesharing Amendment was adopted. However, I find that the timing of the two events was coincidental. Computer Associates argues that

the Bank adopted the more general form of amendment rather than a GTE-specific amendment precisely because it foresaw the Horizon program's use of the ADR software. I find to the contrary. It simply does not make sense to believe the Bank launched a service, knowing that hundreds of thousands of dollars in royalties rode in the balance, in the wake of a significant contractual modification that highlighted the Bank's actions, and then failed to make the payments, hoping ADR would not notice.

I have received testimony, which I credit, that the parties adopted the Timesharing Amendment for the specific purpose of allowing GTE to build its own application programs around the ADR software tools. The parties were both aware from their oral and written communications of that purpose. That is the reason an option for a GTE-specific amendment was made available. GTE is the only Bank client that makes use of the ADR software tools in its own applications. That fact was made known to ADR.

Computer Associates argues that the use made by the Bank's mutual fund customers must also be determined to fall within the terms of the Timesharing Amendment because, but for the use of the Bank's software, Computer Associates would license software directly to the Bank's customers (and receive, presumably, a 100% royalty fee). However, I do not find that to be the case. First, the Bank's customers would not have any use for a database management tool in the absence of a database to manage. State Street was selected as a custodian for the assets it manages long before the advent of computers, and there is no reason to think that the Bank's custodianship will end if the mutual fund customers are denied instant on-line access to fund information. Second, I do not credit the argument that the Bank's customers would pay a 100% royalty fee (but for the Bank's making Horizon available to them at far lower cost). Rather, I find that more likely than not even the one percent fee Computer Associates would require of the Bank's customers would make the use of the Horizon program prohibitively expen-

sive. Contemplation of such a large fee for the kind of limited indirect use of Computer Associates' software made by the Bank's customers through Horizon was simply not manifested by either party at the time that the Timesharing Amendment was adopted.

I note that Computer Associates does not claim that the use made by the Bank's customers violates the Timesharing Amendment. Rather, plaintiff contends that the use made falls within the terms of the Timesharing Amendment, subjecting each customer to a one percent royalty fee. (Plaintiff further contends that the failure to pay such a fee was a material breach of the license agreement allowing plaintiff to terminate maintenance support.)

My conclusion that the Timesharing Amendment does not apply affects the damages that may be awarded in this case. The one percent provision in that agreement is Computer Associates' proposed measure of damages; if that provision does not apply, any amount Computer Associates may recover may be significantly less than the one percent per customer per year it seeks.

It is still necessary to consider as well whether the use made by Bank customers violates the Basic Agreement. If so, Computer Associates will be entitled to some relief, including, arguably, a right to terminate maintenance support. It is to that subject, therefore, that I turn next.

### B.

The Basic Agreement provides: "Customer agrees to refrain from using the Equipment [including the Datacom program] for other customer-sites or customers on a service basis." Computer Associates alleges that State Street has violated the terms of that provision by allowing customers to upload and download information, indirectly utilizing the Datacom program. State Street primarily contends that the Basic Agreement prohibits only direct use, not indirect use.

The term employed in the agreement itself is "using." That term in most contexts includes both direct and indirect use. As noted above, it was clearly contemplated by the parties to the Basic Agreement that State Street would use the software to service customer accounts. What may not have been anticipated in 1980 when the contract was signed is that the customers themselves would have on-line access to an applications program of State Street that uses the software. Use by a customer itself is more susceptible of characterization as direct use for a customer than is use by the Bank for the customer. Of course, use of the Datacom program to support a customer's own applications (as in the GTE arrangement) is still more susceptible of characterization as direct use of Datacom for a customer than is the customer's use of the Horizon program (which in turn uses Datacom). Since the immediacy of the use contested in this case lies along a continuum, in which some uses are clearly permitted and others clearly not, a classification of the use as "direct" or "indirect" in the sense in which the Bank employs those terms does not resolve this case.

On the other hand, it is not decisive either to focus, as plaintiff does, on the term "on a service basis." Some services were understood by the parties to be permissible, but others were understood to be taboo. Again, what must be decided is what intent the parties manifested, if indeed they did manifest an intent, with respect to a customer's obtaining self-service through the use of on-line access provided by the Bank.

### IV. An "Omitted Case"

Although a great deal of parol evidence was presented that informs a decisionmaker about the meaning of the terms "timesharing" and "service bureau" (terms used in the Timesharing Amendment), little evidence has been presented to inform one about the meaning of the words and phrases used in the relevant provision of the Basic Agreement. On the basis of the limited evidence before me, I conclude that there is a distinct possibility that a reasonable factfinder could find in any of three ways—the way plaintiff asserts, the way defendant asserts, or by determining that the parties totally failed to contemplate

these circumstances, and thus left a gap. On the present factual record, it seems most likely that a factfinder will find—perhaps even cannot reasonably do otherwise than find—that a gap exists. That is, the finding may be—and perhaps must be—that the contract simply did not address the question presented by this case. This case probably is, in a phrase used by Professor Farnsworth, an "omitted case." 2 E. Allen Farnsworth, *Farnsworth on Contracts* § 7.16 (1990). The gap is not so fundamental as to support a conclusion that there was no contract (no "meeting of the minds"). What provision does the legal system make for filling the gap—for determining the answer to an "omitted case"?

The legal process involved in determining answers for questions that the terms of a contract leave unanswered is often described as one of "implication," though "inference" would be a more apt term for describing an interpreter's search for the meaning of the contract in such circumstances. *See id.* at 305 n. 12. Both of these descriptions are potentially misleading, however, because they suggest that the answer is in the contract itself and need only be derived from it by thorough examination and analysis. A more candid explanation is that the contract left a gap—it made no prescription for an "omitted case"—and some decisionmaker or set of decisionmakers must now fill that gap. Of course, the parties may be the decisionmakers. They may reach a supplemental agreement that supplies an answer for the omitted case now in litigation. If they cannot do so, the legal process must provide the answer. When a court, or a jury, or the court and jury together (whichever may be determined to be the appropriate decisionmaker(s)) provides the answer, it is a newly developed answer, not one that existed in the contract and remained merely to be inferred. Neither "implication" nor "inference" is a strictly accurate description of this process. A clearer and more candid explanation is to describe the process as "extrapolating" from the contract. *See id.* at 307. The freedom of choice of the decisionmaker who is "extrapolating" is, however, not unlimited. The

decisionmaker is not free to supply an answer the decisionmaker might think best. Instead, the decisionmaker is constrained to work out an answer that is consistent with all that the parties did agree to in arriving at a contract. As Lord Mansfield expressed the point, the answer must be consistent with "the essence of the agreement" of the parties. *Kingston v. Preston*, Lofft 194, 198, 98 Eng.Rep. 606, 608, 2 Doug. 689, 691, 99 Eng.Rep. 437, 438 (1773).

Drawing these points together in a brief statement of the process, one may formulate the guiding rule as follows: A court faced with an "omitted case," 2 E. Allen Farnsworth, *supra*, § 7.16, "seeks a fair bargain," *id.* at 307, by "extrapolating," *id.*, from the "essence of the agreement," *Kingston, supra.*

> It [the court] may, for example, justify the term it supplies on the ground that the term prevents one party from being in a position of "economic servility" and "completely at the mercy" of the other. It is likely to supply a term that is suitable for a particular market or other segment of society or even for society in general. Furthermore, if the situation is a recurring one, a court will try to resolve the omitted case in a way that yields a convenient rule or that promotes certainty. As the Supreme Court of Pennsylvania has said, "It would obviously be quite unreasonable and wholly undesirable to imply an obligation that would necessarily be vague, uncertain and generally impractical."

2 E. Allen Farnsworth, *supra*, at 307–08 (footnotes omitted).

If in seeking to arrive at the manifested meaning of the contract, the court concludes that the last possibility of the three possibilities enumerated above is correct—that there is a gap in the contract—or concludes that the choice among the three is one for the factfinder and the factfinder finds the third possibility is correct, then the gap must be filled through the legal process. The decisionmaker(s) must fill the gap in a way that best fits the answer to the omitted case within the total contractu-

al arrangement. Although the point is more often expressed in another way, a candid statement of what is occurring in circumstances such as these, is that a person applying the law or finding facts (whichever may be determined to be an appropriate characterization) is filling gaps left by the parties and not merely locating the answers of the parties to questions that they considered.

The legal process for determining an answer for an "omitted case"—for a gap in contract terms—is closely analogous to (though not precisely identical with) the process for filling in gaps in statutes. The description of this process as one of extrapolation rather than implication or inference is in substance, if not precisely the same in terminology, consistent with opinions of both the Supreme Court of the United States and the Supreme Judicial Court of Massachusetts addressing gaps in legislation. *See, e.g., Miles v. Apex Marine Corp.,* — U.S. —, 111 S.Ct. 317, 325, 112 L.Ed.2d 275 (1990) ("when [Congress] does speak directly to a question, the courts are not free to 'supplement' Congress' answer so thoroughly that the Act becomes meaningless.... *Moragne* involved gap-filling in an area left open by statute; supplementation was entirely appropriate.") (citation and internal quotation marks omitted); *Mailhot v. Travelers Ins. Co.,* 375 Mass. 342, 377 N.E.2d 681, 682 (1978) ("[T]here are likely to be ... gaps in the statutory provisions. As ... difficulties are revealed, the courts are called upon to interweave the statute with decisions answering the difficulties and composing, as far as feasible and reasonable, an harmonious structure faithful to the basic designs and purposes of the Legislature.").

### V. Resolution

For two reasons, I need not now determine the answer to be supplied for this "omitted case," or even who shall fashion the answer. First, in the context of the present motion for preliminary injunction, I need not resolve debatable issues about whether the gap-filling determination is for a jury or a court (a problem not present when filling gaps in statutes). In the present context, the court is acting as both factfinder and lawmaker. Second, although filling gaps may be critical to an award of damages at a later stage of proceedings, it is not essential to my determination that defendant's motion for a preliminary injunction must be granted. To the limited extent that I may need to make a finding on the present record in order to determine whether a preliminary injunction shall be entered, I find that the parties did not consider and answer the question now before this court, as to whether State Street's present practices through Horizon are authorized without additional fees, or are authorized subject to reasonable compensation to be determined by legal proceedings if the parties are unable to agree as to what is reasonable. I conclude that neither party is likely to prevail on its proposed interpretation of the Timesharing Amendment and the Basic Agreement, and that plaintiff should not be allowed to terminate maintenance services while essential gap-filling determinations remain to be made at trial.

In reaching this determination, I have taken into account the contentions of the parties regarding burdens of persuasion. Each party contends that the other has the burden of persuasion on each critical question. Plaintiff contends that the burden is defendant's, both because defendant is the moving party and because defendant's contention that it is acting within the scope of the license agreement is a defense to a charge of copyright infringement on which defendant has the burden of proof at trial. Defendant contends that plaintiff has the burden of proof at trial on its claim of breach of contract, and that just as a court must take account of the burdens of persuasion in ruling on a motion for summary judgment, *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), it must do so in deciding a motion for preliminary injunction.

Plaintiff's position that any burden of persuasion falls on defendant to prove a defense cannot be sustained. As explained in Part II–B, above, plaintiff first must establish a claim for breach of contract before questions of copyright infringement

become relevant. The burden on that ground falls on plaintiff.

I conclude that I must grant a preliminary injunction in this case. First, I conclude that defendant is likely to prevail on its defense that it has not broken the provisions of the Timesharing Amendment. Second, for reasons discussed in Parts III–V, I conclude that defendant has a substantial likelihood of prevailing on its defense to plaintiff's claims with respect to the Basic Agreement, with the possible exception of an obligation of reasonable compensation in an amount to be determined in the trial of this case. Even though the likelihood that defendant will succeed in proving that it has no obligation of additional compensation may be less than fifty percent, it is significant. Weighing this likelihood of success on the merits with the relative balance of harms and the public interest discussed in Part II, I conclude that defendant is entitled to an injunction preserving the status quo until the parties' claims can be fully and fairly litigated. Third, I consider the most likely outcome to be that neither party will prevail in its contentions regarding the meaning of the Basic Agreement. In this circumstance, it is improbable that any gap-filling provision that may be formulated would allow plaintiff to terminate maintenance as a result of defendant's "breach" of a "contract provision" not determinable before judgment is entered in this case (unless an earlier determination is made by agreement of the parties).

## ORDER

For the foregoing reasons, it is hereby Ordered:

(1) Defendant's motion for a preliminary injunction is granted, and the parties are directed to confer to determine whether they can agree upon the terms of an order that is consistent with the rulings in the foregoing Memorandum.

(2) A conference is set for Friday, May 8, 1992 at 4:00 p.m.