67 F.3d 294
 1995 Copr.L.Dec. P 27,438
 NOTICE: Fourth Circuit Local Rule 36(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Thomas A. CRAMER, Plaintiff-Appellant,
v.
CRESTAR FINANCIAL CORPORATION, jointly and severally for
themselves and as successor-in-interest to CFS
Financial Corporation and Continental
Federal Savings Bank, Defendant-Appellee,
and
Crestar Bank, N.A., jointly and severally for themselves and
as successor-in-interest to CFS Financial Corporation and
Continental Federal Savings Bank; John Doe-1; John Doe-2;
JOHN DOE-3; John Doe-4; John Doe-5; John Doe-6; John
Doe-7, Defendants.
Thomas A. Cramer, Plaintiff-Appellant,
v.
Crestar Financial Corporation, jointly and severally for
themselves and as successor-in-interest to CFS
Financial Corporation and Continental
Federal Savings Bank, Defendant-Appellee,
and
CRESTAR BANK, N.A., jointly and severally for themselves and
as successor-in-interest to CFS Financial Corporation and
Continental Federal Savings Bank; John Doe-1; John Doe-2;
JOHN DOE-3; John Doe-4; John Doe-5; John Doe-6; John
Doe-7, Defendants.
 Nos. 94-2629, 95-1069.
 United States Court of Appeals, Fourth Circuit.
 Sept. 13, 1995.
 
 ARGUED: Douglas James Cole, TAYLOR, NEWSOME, TINKHAM & COLE, Fairfax, Virginia, for Appellant.
 E.D.Va.
 AFFIRMED.
 Thomas John Cawley, HUNTON & WILLIAMS, Fairfax, Virginia, for Appellee. ON BRIEF: Stuart A. Raphael, HUNTON & WILLIAMS, Fairfax, Virginia.
 Before ERVIN, Chief Judge, MURNAGHAN, Circuit Judge, and PHILLIPS, Senior Circuit Judge.
 OPINION
 PER CURIAM:
 
 
 1
 Thomas A. Cramer appeals from the order of the district court granting summary judgment in favor of defendants Crestar Financial Corporation and Crestar Bank (collectively, "Crestar") on Cramer's copyright infringement claim. He challenges the ruling that Crestar is the owner of the copyright to a computer program, which he allegedly authored, as a work made for hire. Cramer also appeals from the district court's order awarding attorneys' fees and costs to Crestar. Finding no error, we affirm.
 
 
 2
 * The critical facts, either undisputed or taken in the light most favorable to Cramer on the summary judgment record, are these.
 
 
 3
 Cramer was employed from 1985 to 1993 as a senior vice president of Continental Federal Savings Bank ("Continental") and the director of its information systems department. As such, he supervised all of Continental's computer operations and in-house software development. J.A. 75, 82, 246-47. He reported directly to Chief Operating Officer Jerry Baugh, who reported directly to the President and Chief Executive Officer.
 
 
 4
 Beginning in early 1990, Continental began to pursue the idea of providing Point of Sale ("POS") services to its customers to allow them to make purchases from merchants with credit and debit cards at the "point of sale," with the transactions settled electronically between the merchant and the bank on the same day. Cramer was among the Continental officers with whom this idea originated.
 
 
 5
 On March 6, 1990, Continental's Data Processing Committee, of which Cramer was a member, voted unanimously to recommend to the Board of Directors that Continental pursue development of a POS business. On March 27, 1990, the Board of Directors voted to begin a pilot POS program, after Cramer told the Board that Continental had "the technology, staff and computers in place to support this new program." J.A. 387. Baugh formed a team to implement the POS program and included Cramer to lead the information systems portion of the effort. By 1992, Continental was providing POS support services to hundreds of vendors. A software program (the "POS program") was instrumental in operating the POS business.
 
 
 6
 Not surprisingly, the parties offer conflicting versions of the creation of the POS program. Cramer's version is as follows: Cramer spent hundreds of hours of his own time, beginning perhaps as early as 1989, designing and writing a computer program to implement POS, at home on his own computer equipment, with no direction, authorization, or other input from Continental. In early 1991, when he was finished writing the original "source code" of his POS program (the human readable/editable version of a program which, when translated into the binary language of computers by a "compiling program," tells a computer how to run the program) in a computer language suitable for his home computer, he took it into work. With Baugh's permission, he installed the program on Continental's mainframe computer, compiled it, and performed a test run. He claims that Baugh permitted the test run on the condition that Continental could use the POS program royalty-free, and that Cramer authorized Continental to use his POS software in its POS business on the condition that he be allowed to manage the products and services that Continental marketed based on the POS software. Later in 1991, he translated the program into a combination of two other computer languages, COBOL and CA-EARL, thereby creating an interim version. Finally, another Continental employee, Juan Carlos Lama, a computer pro grammer, translated this second version entirely into COBOL, thereby creating the final version of the POS program that is the subject of this suit. Cramer Decl., J.A. 470.[1]
 
 
 7
 In May 1993, Continental and Crestar merged. In the months before the merger, Continental's officers and employees were involved in assisting Crestar to convert Continental's data and customer information systems; specifically, Cramer was in charge of supervising the effort to convert the POS system and other computerized systems. In addition, as director of information systems, Cramer was responsible for disclosing to Crestar all material facts surrounding Continental's POS system and other computer systems, including the existence of any intellectual property licensing agreements. Cramer has conceded, however, that he never informed Crestar that he claimed to own copyright in the POS program.
 
 
 8
 Crestar paid substantial bonuses to Continental employees essential to the conversion effort; it paid Cramer 100% of his annual Continental salary as a bonus for his "full cooperation and support" in converting the computer systems. J.A. 291, 473-74. Cramer met with a Crestar executive in March 1993 to discuss whether he would be hired permanently by Crestar. When he did not receive an offer of employment promptly, Cramer suspected that he might never receive one. J.A. 243, 265-68. As he admitted in deposition, Cramer then filed a copyright registration in the most recent POS program "as a protection" in the event he was not offered a job by Crestar and would not have filed it had he received a job offer. J.A. 242-43, 264-65. With his copyright application, he submitted a copy of the final version of the source code, claiming that he was the author of the entire text.[2] The Copyright Office registered the copyright to the source code on April 29, 1993.
 
 
 9
 Cramer then announced his resignation in May 1993, stating that he would have preferred a position at Crestar but felt compelled to accept an offer from another firm. J.A. 426-27. As he admitted in deposition, no one had told him that he would not receive a job offer from Crestar and he still hoped to receive one even after his resignation. J.A. 243, 515-16.
 
 
 10
 Crestar did not learn about Cramer's copyright claims until Cramer brought this action against Crestar more than a year after his resignation, in June 1994. In his complaint, Cramer made several claims against Crestar, including copyright infringement, conversion, breach of contract, defamation, fraud, slander of Cramer's title to the program, tortious interference with economic expectancy, and intentional infliction of emotional distress. He also sought statutory penalties under ERISA because he did not receive a copy of his retirement plan within 30 days of his request. Finally, he sought a declaratory judgment that he was the owner of the copyright. In support of his infringement claim, Cramer alleged that he had given Continental an oral license to use the POS program but had revoked the license by resigning, although he admits that he did not inform either Continental or Crestar of his revocation. J.A. 262-64, 268-71.
 
 
 11
 The district court granted Crestar's motion under Fed.R.Civ.P. 12(b)(6) to dismiss the conversion, defamation, fraud, slander of title, and tortious interference claims. Crestar then moved for summary judgment on all remaining counts.
 
 
 12
 Because Cramer's complaint referred only to the source code printed from Continental's computer and registered with the Copyright Office, Crestar based its summary judgment motion on Lama's testimony that Cramer had not written any of that source code. Cramer then attempted to cure his previous misstatement to the Copyright Office by filing a correction which stated that he was now applying for a copyright for only 128 of the 193 pages of the source code and that it was not an original work but rather a derivative from a preexisting work and that he was the author of the entire text of the 128 pages. J.A. 540. Cramer eventually admitted that Lama had written the source code filed with the Copyright Office, but claimed that it was merely a translation of a program that Cramer had written. Cramer Aff., J.A. 470.
 
 
 13
 The district court granted Crestar's summary judgment motion with respect to the copyright claims, finding that the program was a work made for hire. The court also granted summary judgment on the intentional infliction of emotional distress claim, denied summary judgment on the ERISA claim because Crestar had made an offer of judgment on that count, and dismissed the remaining breach of contract claim for lack of independent jurisdiction. Finally, the court awarded Crestar $75,395.47 in costs and attorneys' fees.
 
 
 14
 On this appeal, Cramer challenges only the summary judgment dismissal of his copyright claims and the award of attorneys' fees and costs.
 
 II
 
 15
 * We review grants of summary judgment de novo. Overstreet v. Kentucky Cent. Life Ins. Co., 950 F.2d 931, 938 (4th Cir.1991). "Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir.1990) (citing Fed.R.Civ.P. 56(c)). The facts and inferences to be drawn from the facts must be viewed in the light most favorable to the nonmoving party, and this party is entitled to "have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in it resolved favorably to him." Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir.1979).
 
 B
 
 16
 Copyright ownership of a work is presumed to vest in its author--"the person who translates an idea into a fixed, tangible expression"--unless the actual author's employer can establish, the burden being on the employer, that it is a "work made for hire." Community for Creative Non-Violence v. Reid, 490 U.S. 730, 737 (1989). If a work is one made for hire, the employer for whom it was prepared is considered the author and is presumed to own the copyright. Id. (construing 17 U.S.C. Sec. 201(b)). The work-for-hire exception is overridden only by a clear writing, signed by the parties, that reserves authorship rights to the employee. 17 U.S.C. Sec. 201(b). No such writing existed here.[3]
 
 
 17
 The employer can show that a work is made for hire by establishing that it was (1) created by an employee (2) acting within the scope of the employment relationship. 17 U.S.C.A. Sec. 101 (West Supp.1995). Cramer was indisputably a full-time, salaried employee of Continental at all relevant times: from 1989 to 1991, when he claims to have written the original version of the POS program; in 1991, when he claims to have completed the interim version; and in 1992, when he claims the final version was completed.
 
 
 18
 The copyright statute does not itself define "scope of employment," but it is established that Congress intended to incorporate common law agency principles into the copyright statute. Reid, 490 U.S. at 740 (citing Restatement (Second) of Agency Sec. 228 (1958)). Consequently, to show that the creation of the POS program was within the scope of Cramer's employment, Crestar had to show that (1) the work was of the type for which Cramer was hired to perform; (2) Cramer's creation of the program occurred "substantially within the authorized time and space limits" of his job; and (3) was "actuated, at least in part, by a purpose to serve" Continental's interests. Avtec Systems, Inc. v. Peiffer, 21 F.3d 568, 571 (4th Cir.1994) (quoting Restatement (Second) of Agency Sec. 228 (1958)).
 
 
 19
 Because registration is a prerequisite to filing an infringement action, 17 U.S.C. Sec. 411(a), and because Cramer had registered a copyright only in the latest version of the POS program and has alleged infringement of that copyright alone, any claim that Crestar infringed the copyright in any earlier version is legally barred. We therefore need address only whether the creation of the latest version whose source code was filed with the Copyright Office meets these three elements.
 
 
 20
 Creation of that program was work of the type Cramer was hired to perform; the first element of the Restatement test is therefore satisfied. Although computer programming was not among Cramer's duties per se, he was director of information systems, and, as such, he supervised all of Continental's computer operations and in-house software development.[4] He was also specifically responsible for the information systems portion of the effort to implement and develop Continental's POS business. Consequently, although "copyright does not vest in the employer solely because 'the subject matter of the work ... bears upon or arises out of the employee's activities for his employer,' " Avtec, 21 F.3d at 572, the undisputed facts here compel the conclusion that the creation of a software system for the POS business was squarely within Cramer's area of responsibility at Continental, and therefore "of the type he was hired to perform," whether he wrote the program himself or assigned the task to subordinates.
 
 
 21
 The second element is also satisfied. Although it is not clear that Cramer was the author of the relevant version of the program, Cramer claims that he was, and viewing the evidence in the light most favorable to Cramer entails crediting this claim. On that assumption, we nevertheless conclude that on the undisputed facts he wrote the program (the original and all derivatives) substantially within the authorized time and space limits of his job--even if he did so at home, outside regular work hours, on his own initiative, and using his own equipment. When the first element of the Restatement test is met--that the work is of the kind the employee is hired to perform--"courts have tended not to grant employees authorship rights solely on the basis that the work was done at home on off-hours." Avtec, 21 F.3d at 571. Cramer admitted that his job required him to work long hours, on weekends, and at home, so he can hardly claim now that work he did at home was by definition not within the scope of his employment. J.A. 508-09. Moreover, Cramer was a salaried employee and was not compensated separately for each task that he performed. It is therefore irrelevant that Crestar cannot produce records of his having been compensated for the hours spent at home writing the original version of the program so long as the work was done during the time period in which he was employed by Continental. In addition, Cramer never claims that any work he did to create derivative versions of the program, including the final version for which he registered a copyright and which is the subject of this suit, were created elsewhere than during the time and space limits that defined his employment relationship with Continental.
 
 
 22
 The third element of the scope-of-employment test is also met. The record amply supports the necessary conclusion that, as a matter of law, Cramer was motivated at least in part by a purpose to serve Con tinental's interests when he wrote the program. See Restatement (Second) of Agency Sec. 236 cmt. b ("The fact that the predominant motive of the servant is to benefit himself or a third person does not prevent the act from being within the scope of employment[ ][i]f the purpose of serving the master's business actuates the servant to any appreciable extent...."). Cramer has contended throughout that he was not motivated at all to serve Continental's interests when he wrote the program, but was instead seeking solely to capitalize privately on the demand in the banking industry for POS software by writing the program and selling it to banks. The summary judgment record conclusively shows otherwise.
 
 
 23
 Cramer admitted in deposition that he promoted the idea of Continental's pursuing a POS business because it "would be a good idea for the bank to get out in front of this concept." J.A. 237. And, he testified in deposition as follows:
 
 
 24
 Q: So, in other words, your work on computer software and information systems and POS in your mind clearly furthered the interests of Continental?
 
 
 25
 A: That's right, yes.
 
 
 26
 Q: And that was a large part of the reason why you worked so hard was to make Continental an effective institution, correct?
 
 
 27
 A: Yes.
 
 J.A. 508. He also testified:
 
 28
 A: Well, I told [Baugh] ... that we would put [the POS program] on the system and he could--we could run it as a service to the new businesses we were developing--I was developing--as long as I would get the opportunity to run and grow that business.
 
 
 29
 Q: You personally or you as an employee?
 
 
 30
 A: Oh, myself as an employee.
 
 
 31
 J.A. 238. He stated at the Data Processing Committee meeting that pursuing POS would benefit Continental's business by "substantially increas[ing] profitable corporate and retail relationships." J.A. 382. In his complaint, he claimed that "a large part of what made Continental attractive to [Crestar] was its powerful POS computer program and the substantial share of the POS market Continental had captured due, in part, to Cramer's POS computer program." J.A. 12. These candid concessions by Cramer amply support, indeed compel, the conclusion that, when and if Cramer wrote the program, he was motivated at least in part to serve Continental's interests as its employee.
 
 
 32
 With all three elements of the Restatement test satisfied, the district court was correct in concluding that Cramer wrote the program, if at all, within the scope of his employment with Continental and that Continental, and therefore Crestar, owned the rights to the POS program under the work-for-hire doctrine.[5]
 
 
 33
 We therefore affirm the district court's judgment on the grounds that, even if Cramer did write any version of the POS program, Crestar owned copyright in it as a work for hire.[6]
 
 III
 
 34
 Cramer also challenges the district court's award to Crestar of its costs and attorneys' fees in the amount of $75,395.47. Section 505 of the Copyright Act provides
 
 
 35
 In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof. Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs.
 
 
 36
 17 U.S.C.A. Sec. 505 (West 1977).
 
 
 37
 A key provision is that the party awarded costs must be a prevailing party. Cramer argues that the district court erred in deeming Crestar a prevailing party. However, we agree with the district court's conclusion that Crestar "was the prevailing party on the copyright counts, because, in fact, [Crestar] won summary judgment in its favor against the allegation that it had committed certain copyright violations." J.A. 689. The only claim upon which Cramer enjoyed any measure of success is the ERISA claim, for which Crestar has made an offer of judgment that Cramer has yet to accept and which in any event is not a copyright claim. In contrast, Crestar prevailed in its defense against Cramer's claims for declaratory judgment that he was owner of the copyright to the POS program and for infringement of that copyright. Crestar also secured a dismissal of several other claims (specifically the conversion of the POS program claim and the slander of title to software claim) on the grounds that they were preempted by section 301(a) of the Copyright Act. See Rosciszewski v. Arete Assocs., 1 F.3d 225, 233 (4th Cir.1993) ("when Sec. 301(a) completely preempts a state-law claim, it becomes a federal claim under" the Copyright Act). Crestar is therefore rightly deemed the prevailing party for purposes of section 505.
 
 
 38
 Cramer also argues that the evidence does not support the district court's award. In Rosciszewski, this Court held that a district court should be guided by the following factors in determining whether to award costs and attorneys' fees to a prevailing party under section 505: (1) "the motivation of the parties;" (2) "the objective reasonableness of the legal and factual positions advanced;" (3) "the need in particular circumstances to advance considerations of compensation and deterrence;" and (4) "any other relevant factor presented." 1 F.3d at 234 (citing Lieb v. Topstone Indus., 788 F.2d 151, 156 (3d Cir.1986)); see also Fogerty v. Fantasy, Inc., 114 S.Ct. 1023, 1033 n. 19 (1994) (citing these factors with approval). The district court applied these factors, finding that the first and second factors weighed in favor of an award for Crestar. Regarding the first factor, it noted that the propriety of Cramer's motivation in bringing the suit was questionable--that he brought it only after becoming concerned about his job security, "as a way of sort of getting a guarantee, almost an insurance policy for future employment." J.A. 690. With respect to the second factor, it noted that there "were significant concerns about ... the reasonableness and factual bases upon which" Cramer's grounded his lawsuit. Id. These findings are well supported by the record and are therefore not clearly erroneous. Moreover, we note that the third factor also weighs in favor of the award of costs and fees as a means to deter future strike suits by disgruntled employees. We conclude that the award of costs and fees was therefore not an abuse of the district court's discretion.
 
 
 39
 Finally, we must evaluate whether the district court erred in determining the amount of a reasonable fee award. Rosciszewski, 1 F.3d at 234 n. 8. Cramer contends that the award is unreasonable because Crestar's counsel did not submit an affidavit "based on personal knowledge" stating that the itemizations were correct and because the award includes fees for unrelated matters. This argument has little merit. Crestar did submit a detailed 24-page report itemizing the fees which it sought to recover and a detailed itemization of costs, J.A. 549-623, 634-58; Cramer fails to identify any specific item billed that did not relate to the copyright claims. Crestar also submitted an affidavit by an expert concluding that the time spent on the copyright matters was reasonable and appropriate. J.A. 631-32. Finally, Crestar's counsel represented to the court under oath that it actually incurred the itemized costs and fees. J.A. 545.
 
 
 40
 We agree with the district court's rulings that the fees were reasonable in light of the complexity of the case, that the charges were all "related specifically to the copyright claims," and that Cramer had fair warning that he risked an award of fees by pursuing the lawsuit. J.A. 689-91. The district court therefore did not abuse its discretion in finding that the amount of costs and fees claimed was reasonable. J.A. 691.
 
 AFFIRMED
 
 41
 * * *
 
 
 42
 Cramer Dep., J.A. 246-47, 253.
 
 
 
 [1]
 In contrast, Crestar claims that Lama wrote the final version of the POS program. Lama stated in deposition that he wrote most of the source code used by Continental in its POS business "from scratch," that a few portions were written by another Continental employee, that the rest was licensed to Continental by Systematics, Inc., a vendor of computer software for banks, J.A. 145-98, and that Cramer had written none of the final version of the program himself, J.A. 223. He admitted in a sworn declaration that there had existed an interim program written in CA-EARL that Cramer may have authored. J.A. 472. Lama testified, however, that Cramer's only input to the final version was to sketch on a blackboard the general description of how the flow of electronic transactions in the POS business was supposed to work. J.A. 140-45. To the extent that the parties' versions differ, we credit Cramer's version for the purpose of this appeal
 
 
 [2]
 This is the version that Cramer claims was a translation by Lama of the program Cramer authored but that Crestar claims was originally authored by Lama. Cramer apparently arranged for Lama to meet him at work on a Saturday morning and to print the copy of the source code off Continental's mainframe computer for him. J.A. 201-03
 
 
 [3]
 Cramer's claim that there was an oral agreement that Continental could use the program only so long as he remained the employee in charge of its use is therefore irrelevant
 
 
 [4]
 Cramer himself testified in deposition that:
 Q: If it had to do with computers and systems and programs, that would be Tom Cramer's responsibility?
 A: Yes.
 Q: All right. Now, you were also, I take it, in charge of any research and development efforts that Continental was making in the area of automation in computers?
 A: Yes.
 Q: Who in this organizational structure was in charge of research and development, in other words, coming up with new products? Was there anybody that had the responsibility for coming up with new products that the bank might either use or sell?
 A: That would be either myself or Kevin,....
 Q: Okay. So that was obviously part of your responsibility.
 A: Yes.
 
 
 [5]
 Cramer contends that the district court's summary conclusion that "the work was clearly within the scope of [Cramer's] employment," without specific findings as to who wrote the program and each of the elements of the scope-of-employment test demonstrates that they were not considered. This is unavailing. In our de novo review of the summary judgment, we can of course make our own conclusions from the record as well as assume, as we properly could do here, that the district court made specific intermediate findings consistent with its ultimate scope of employment conclusion. See 9A Wright & Miller, Federal Practice and Procedure: Civil Sec. 2579, at 543 (1995). And, of course, specific findings of fact are not essential to the validity of a grant of summary judgment. Id., Sec. 2575, at 506
 
 
 [6]
 Crestar raises two additional theories to justify summary judgment: (1) that Cramer was estopped from claiming copyright infringement by his failure to be candid with Crestar regarding his claim of ownership, and (2) that Cramer made material misrepresentations to the Copyright Office in his application to register a copyright, thereby invalidating his copyright. We do not address them here because we agree with the district court that any POS program that Cramer did create was a work-for-hire