**Coby RECHT, Petitioner,**

v.

**METRO GOLDWYN MAYER STUDIO, INC., itself or on behalf of one of its subsidiaries, Respondent.**

No. 08–CV–250–SLC.

United States District Court, W.D. Wisconsin.

June 12, 2008.

Moshe Zingel, Moshe Zingel Law Firm, Tel Aviv, WI, for Plaintiff.

Jonathan Zavin, Loeb & Loeb LLP, New York, NY, for Defendant.

## ORDER

BARBARA B. CRABB, District Judge.

Because Judge Shabaz is on a medical leave of absence from the court for an indeterminate period, the court is assigning 50% of its caseload automatically to Magistrate Judge Stephen Crocker. It is this court's expectation that the parties in a case assigned to the magistrate judge will give deliberate thought to providing consent for the magistrate judge to preside over all aspects of their case, so as to insure that all cases filed in the Western District of Wisconsin receive the attention they deserve in a timely manner. At this early date, consents to the magistrate judge's jurisdiction have not yet been filed by all the parties to this action. Therefore, for the purpose of issuing this order only, I am assuming jurisdiction over the case.

This is a proposed civil action for monetary relief brought under the United States Copyright Act, 17 U.S.C. §§ 101, 106, 501–505. Petitioner Coby Recht contends that defendant Metro Goldwyn Mayer Studio, Inc. is infringing 14 of his copyrighted works by reproducing, adapting and distributing a 1980s rock opera movie called "The Apple" that contains those works. Jurisdiction is present under 28 U.S.C. §§ 1331 and 1338(a).

Petitioner seeks leave to proceed without prepayment of fees and costs or providing security for such fees and costs, pursuant to 28 U.S.C. § 1915. From petitioner's affidavit of indigency, it appears that he qualifies financially to proceed without prepaying the fees and costs associated with filing this lawsuit. However, whenever a petitioner asks for leave to proceed without prepayment under 28 U.S.C. § 1915, the court must review the merits of his proposed complaint and dismiss it if the claims are frivolous or malicious, fail to state a claim upon which relief may be granted or are brought against a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2).

Petitioner asserts eight causes of action: seven are claims of copyright infringement related to seven different methods by which respondent reproduced, adapted or distributed The Apple movie and 13 songs and one screenplay embedded in the movie and thereby infringed copyrights allegedly owned by petitioner; the eighth is a claim of breach of contract related to respondent's collection of publishing royalties allegedly owed to petitioner pursuant to an agreement between petitioner and defendant's predecessor in interest. (Petitioner asserts a ninth "cause of action" for attorney fees under 17 U.S.C. § 505. However, because a claim for attorney fees is not an independent cause of action, but rather a statutory remedy, petitioner's ninth "cause of action" will be treated accordingly.) Petitioner's allegations allow an inference to be drawn that he is the "owner" of the copyrights in 13 songs and one screenplay for The Apple movie because petitioner has alleged that he authored the songs and coauthored the screenplay, and the agreement he made to prepare the songs and screenplay for the producer and transfer ownership of his copyrights to a Hebrew musical does not show that he prepared the songs and screenplay for The Apple movie as a "work made for hire" or transferred ownership of his copyrights in the work prepared for The Apple movie. Moreover, respondents' alleged acts of reproducing, adapting and distributing The Apple movie in DVD and digitized format in counts I–VII of petitioner's complaint are forms of "copying constituent elements of the work." Therefore, petitioner will be granted leave to proceed on his seven copyright infringement claims. As for petitioner's claim of breach of contract, be-

cause petitioner alleges that he had an agreement with the producer that allowed it to collect only 50% of the publishing fees, and alleges that respondent is a successor in interest to the producer's agreement and is collecting 100% of the publishing fees, petitioner will be granted leave to proceed on this claim as well. Finally, because petitioner allegedly coauthored the screenplay with Menachem Golan, Golan has an interest in the outcome of this case and must be served notice of this action and given the opportunity to intervene.

In his complaint, petitioner makes the following allegations of fact.

## ALLEGATIONS OF FACT

### A. *Parties*

Petitioner Coby Recht is a citizen and resident of Israel. He is a distinguished composer, songwriter and singer who is considered to be one of the "forefathers of Rock music in Israel." Petitioner is the author of a musical called "The Apple" written in Hebrew in 1977 and the coauthor of a "loose" English language movie adaptation of that play also called "The Apple."

Respondent Metro Goldwyn Mayer, Inc. is an independent, privately-held production and distribution company that owns the world's largest library of modern films. Respondent produces sound recordings and picture films and manufactures, distributes, sells and licenses sound recordings and picture films in "phonorecords" such as DVDs. Defendant is the successor in interest to Cannon Group, Inc., a company that produced the movie "The Apple" in 1979 under the control of Menachem Golan and Yoram Globus. (In 1985, Cannon merged with Pathé Communications Corp. On November 1, 1990, Cannon–Pathé acquired 98.5% of MGM/UA Communications Co. and merged with it. On May 1, 1992, pursuant to a foreclosure action on Pathé's stock in MGM, MGM's shares were sold to MGM Holdings Corporation, a wholly owned shell subsidiary of Credit Lyonnais. On August 28, 1992, MGM was delisted and became private.)

### B. *The Agreement*

In or around 1977, petitioner wrote a Hebrew manuscript and composed, performed and produced music with Hebrew lyrics for a musical stage play called "The Apple." In 1979, petitioner met with Hollywood producer Menachem Golan and showed him his work on the Hebrew musical. Golan decided that he would like to transform the Hebrew musical into a motion picture in English for worldwide distribution.

Golan's production company, Golan–Globus Production, Ltd. had its attorney in Israel draft an agreement in Hebrew for that purpose. The agreement referred to petitioner and his ex-wife Iris Recht "jointly and severally" as a single party. Section 2 of the translated copy of the agreement describes the transfer as follows:

Recht is selling and transferring and the Company is hereby buying and purchasing all the copyrights of any type and kind to the musical including but not limited to the publishing rights to the musical as specified in Section 8 below, and this for the purpose of producing plays and/or records and/or movies and/or production *on any type of media* in accordance with the foregoing musical.

(Emphasis added). The phrase "any type of media" is an incorrect translation of the Hebrew term "mida" as it was used in the original agreement. The "mida" means "extent." Thus the final phrase in this section of the agreement, properly translated, reads: "for the purpose of producing plays and/or records and/or movies and/or production *in any extent* in accordance with the foregoing musical." "[T]he

musical" included "the story line, dialogue transcript, transcript of background music choruses [and] tunes for choruses." In section 8 of the agreement, the parties' respective rights are addressed further:

> The publishing rights, i.e. 50% of the performance rights and 50% of the mechanical rights will belong to the Company and subject thereto the copyrights which belong worldwide solely to the author will belong to Recht in their entirety and Recht undertakes to remit an irrevocable instruction to SACEM that in the event that publishing monies are transferred to them Recht will endorse them, by an irrevocable instruction to the Company and this in accordance with the foregoing provisions.

However, "[i]n the event that within two years of signing this agreement the Company does not ensure that a movie and/or play and/or musical are produced, it will return the rights thereof to Recht" or pay to extend the rights for an additional two years.

The agreement anticipated that additional scripts would be required for the purpose of production and required petitioner to "make [himself] available to the Company in order to finish writing the musical and the script ... in accordance with the Company's instructions ... until the writing thereof is completed which is estimated to be approximately three months ..." Moreover, because petitioner's and Iris's "writing of the musical and script" was to be done abroad, the "Company" agreed to finance petitioner's and Iris's travel and work expenses. In consideration for petitioner's obligations, the agreement provided that petitioner would receive 5% of the gross box revenue worldwide from a musical produced, 5% of the Company's net revenue from a movie produced "in accordance with the musical," 5% of the producer's net revenue from a record produced and 5% of the Company's net revenue "[f]rom any other byproduct."

Moreover, petitioner and Iris were to receive an advance of 100,000 Israeli Lira in four installments of 25,000 Lira each.

According to the agreement, Golan–Globus Productions could assign its rights under the agreement so long as petitioner's rights were preserved. The parties agreed that a "complete and detailed agreement" would be signed between them in accordance with the agreement; however, "so long as a detailed and complete agreement is not signed as above the principles in this memorandum will be binding upon [the parties] as with any binding contract for all senses and purposes." Petitioner and a representative of Golan–Globus Production Ltd. signed the agreement in 1979. No "complete and detailed" agreement was ever prepared or signed by the parties.

### C. Petitioner's Works Related to The Apple Movie

In 1979, Menachem Golan and Yoram Globus purchased a controlling interest in Cannon Group, Inc., also known as "Cannon Films." That same year, Cannon Films began producing The Apple movie. Pursuant to the agreement between petitioner and Iris Recht and Golan Globus Productions, petitioner and Iris traveled to Los Angeles, London, Berlin and Cannes to create and promote English content for The Apple movie. Petitioner prepared the entire score and soundtrack in English of The Apple movie; he used the Hebrew content "extremely loosely" to create English music that was "new and independent" from the music found in the original Hebrew musical. In addition, petitioner coauthored the story and plot of The Apple movie with Menachem Golan. Iris Recht worked with George Clinton, who had been hired by Cannon as an employee for his work on The Apple movie, to prepare the lyrics for the movie. Petitioner and Iris delivered the musical compositions, cue

sheets, score, manuscript and lyrics to the producers in a timely and satisfactory manner.

The words and music of The Apple movie were registered with the United States Copyright Office on July 23, 2971, Registration No. PAU 000324991. George Clinton prepared and signed the application. Petitioner was listed as the author of music and Iris Recht and George Clinton were listed as authors of lyrics for the movie. Petitioner, Iris Recht, George Clinton and Cannon Films were listed as copyright claimants. Cannon Film's right as a copyright claimant was described as "purchased." The copyright registration listed 15 songs. The final cut of The Apple included 12 of these songs, along with a song not registered, called "Finale Cues." The music includes heavy rock, erotic disco and a blend of various electronic pop genres. Petitioner is the sole author of each of the 13 songs used in The Apple movie and coauthor of the screenplay.

### D. *The Apple Movie Fails and Relations Sour*

The Apple movie is a 1980 rock opera musical with a science fiction theme, set in "futuristic" 1994 dealing with themes of conformity versus rebellion and infused with the allegory of Adam and Eve. The movie was shown at the Cannes Film Festival and then released to theaters on November 20, 1980. The movie was filmed in Panavision-anamorphic format on 35 mm film. In addition, The Apple movie was recorded to VHS videocassettes and broadcast on CBS and Showtime and the songs from the movie were recorded to vinyl records. Cannon Films, the producer of The Apple movie, signed a record production contract deal with CBS France and a sub-publishing deal with P.E.M. Baboo.

Despite the distribution efforts of Cannon Films, CBS France and P.E.M. Baboo, the movie release did not recover the producer's investment into it. The film was a failure with critics and at the box office, possibly because of the waning popularity of disco music and the movie's "rather campy plotline." The movie was shelved soon after its release.

Between 1980 and 1981, the producers of The Apple movie failed to pay petitioner and Iris the last two promised installments of the advance described in the agreement and failed to pay petitioner for the "synchronization right" (the right to use petitioner's musical composition in the motion picture). Petitioner sought legal guidance on the matter and had his attorney send a letter to Golan. The letter explained that "[e]ver since [the original agreement, petitioner and Iris] have been waiting for the negotiations and completion of a new contract for the new music, lyrics and story written for a film produced by you and now being released." In addition, the letter asserted that petitioner and Iris "do not recognize any assignment of rithts [sic] of the music, lyrics and story, because no such assignment of rights was ever signed.... [T]he work included in the [original agreement] is not the work included in the film." Neither Golan nor Golan Globus Production responded to this letter.

Between 1982 and 2004, the film was not exploited in any meaningful way and there was no expectation that the movie would yield net profits.

### E. *The Apple Movie Reappears in New Media*

On or about August 24, 2004, respondent released The Apple movie in DVD format. The release was exploited in sales, rentals and through other media outlets. At the time, the world of entertainment media was exploding, with countries deregulating their traditional monopoly on television and mass communications, and new cable channels and technologies developing to

allow more specialized entertainment markets. In order to compete, defendant needed to transform its portfolio of old media titles into new media titles to allow for the greatest diversification and variety possible. In addition, films of "potentially less mass appeal" could once again be tapped to enhance the diversity and thus marketability of defendant's library when soliciting new media ventures. Moreover, following The Apple's initial failure, the film had come to attract a small cult following.

In 1979 when The Apple movie was originally produced, the following forms of "new media" were not in existence: DVD Sales, DVD Rentals, Cable, Satellite, Pay TV, Pay–Per–View and Self Contained Channels. Indeed, it was not until 1995 that DVD manufacturers announced the existence of the format and not until late 1997 that DVD products were retailed.

To convert "old media" such as 35 mm film to "new media" such as DVD format, the old media must be digitally remastered. Digital remastering requires manipulating the audio and visual features of the original film. The process may include editing the audio to improve signal to noise ratio, sound signals, equalizer balance, integration of Dolby and surround sound, fixing the lens glare and other camera shot flaws, adding optical effects, enhancing camera angles and resolution and re-synchronizing the audio onto a new "Master Disc" using laser technology. In addition, a DVD may include additional features such as optional subtitles and translations. Preparation of the Apple DVD involved at least synchronizing digitized music from The Apple movie and preparing French, Spanish and English subtitles.

Generally, when a company such as MGM wishes to produce a DVD out of old media, it is required to warrant and represent to business partners and affiliates that it has all the copyrights and authorizations necessary to produce the DVD. Prior to August 2004, someone at defendant's copyrights clearance department examined the copyright status of The Apple movie, including petitioner's and Iris's copyrights and the letter contending that petitioner and Iris contended that their rights to the music, lyrics and screenplay in The Apple movie were not assigned.

Nevertheless, defendant did not seek clearance from petitioner or Iris before producing DVDs. Defendant created Master Discs or Master Tapes of The Apple movie in NTSC, PAL and SECAM formats for mass production inside and outside the United States, synchronized digitized music from The Apple movie into images of The Apple and pressed them into a DVD or other digitized copy of The Apple and brought about mass replication of The Apple DVD. To promote the DVD launch, defendant reproduced one trailer and three clips containing digitized music sampling of songs and lyric compositions from The Apple movie. Internationally, defendant directly or indirectly sold The Apple DVDs to the public and distributed The Apple DVD or a digitized copy of The Apple movie to television stations, theaters, DVD retailers and mobile telephone carriers. Moreover, copyrighted music compositions related to The Apple movie have been remastered in new media and continually available to the public on different web sites since August 2004, and defendant has distributed or allowed distribution of the digitized version of the Apple Movie to sources of mass dissemination of information, including websites.

In December 2006, after plaintiff learned of defendant's use of new media to exploit The Apple movie, petitioner's attorney sent a letter of demand to defendant. The letter of demand asserted petitioner's interest in copyrights related to the remastered version of The Apple movie. In May

2007, defendant disclosed revenues collected from The Apple new media exploitation. The disclosure was incomplete and incoherent, lacking revenue reports from major Western European markets, lacking details as to publishing revenues and failing to distinguish between historical and current exploitation. Months of negotiations and exchanges proved fruitless, so plaintiff filed this lawsuit. Defendant has not taken steps to remove any allegedly infringing content from mass distributors.

## OPINION

### A. *Copyright Infringement*

■ To prevail on a claim of copyright infringement, a plaintiff must demonstrate "ownership of a valid copyright" and "copying of constituent elements of the work that are original." *Incredible Technologies, Inc. v. Virtual Technologies, Inc.*, 400 F.3d 1007, 1011 (7th Cir.2005) (citing *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991)).

Plaintiff asserts seven claims of copyright infringement, alleging that defendant directly or indirectly reproduced, adapted or published The Apple movie or parts of The Apple movie that included his music using digitized and remastered "new media." The various activities in which defendant is alleged to have engaged include: creation of remastered master discs or tapes of the songs from The Apple (counts I–II) and synchronization of the digitized songs into a digitized or DVD version of The Apple movie (count VI), mass replication of The Apple DVD (count V), reproduction of trailers and clips including songs from The Apple (count V) and responsibility for distribution of digitized versions of The Apple movie to sources of mass dissemination such as websites (count VII). Because each of defendant's acts relate to "copying" The Apple movie in "new media" format and because the

music and screenplay of The Apple are allegedly original works independent of petitioner's earlier Hebrew musical songs, any of these alleged activities could constitute impermissible "copying of the constituent [and original] elements" of each of the 13 songs and the screenplay found in The Apple movie. 17 U.S.C. § 201(c) (copyright in each separate contribution to a collective work is distinct from copyright in collective whole).

The only real question is whether petitioner is the actual "owner" of the copyrights for the thirteen songs and one screenplay that defendant "copied" in assorted ways. Unless petitioner is the current owner of the copyrights, he has no standing to sue because only "the legal or beneficial owner of an exclusive right under a copyright" may bring a copyright infringement action, and only "while he or she is the owner of it." 17 U.S.C. § 501(b). "Ownership" of a copyrighted work vests initially in the author or coauthors of a work. 17 U.S.C. § 201(a). However, when a work is "made for hire," the person preparing the work for hire is not considered the "author"; instead, the hiring party is the author. 17 U.S.C. § 201(b). Moreover, an author may transfer ownership of any or all of the rights comprised in a copyright by "any means of conveyance" such as a license or other agreement. 17 U.S.C. § 201(c). Petitioner prepared the music and screenplay for The Apple movie pursuant to an agreement by which he agreed to transfer his copyrights in The Apple Hebrew musical to Golan Globus Productions and agreed to "finish writing the musical and the script in accordance with" the producer's instructions in exchange for a percentage of revenue and publishing rights. Therefore, I must determine whether petitioner prepared the music and screenplay as a "work made for hire" or transferred his ownership of the copyrights by agreement.

### 1. Work made for hire

■ 17 U.S.C. § 101 limits "work made for hire" to work either "prepared by an employee within the scope of his or her employment" or commissioned work in which "the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." Because the agreement does not expressly define petitioner's work on The Apple movie as a "work made for hire," petitioner's work is not commissioned "work made for hire" under § 101. Thus, the only question is whether petitioner prepared the music and screenplay as "an employee" of the producers. To determine whether a hired party is an "employee" acting within the scope of his employment, a court must consider "the hiring party's right to control the manner and means by which the product is accomplished." *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 751, 109 S.Ct. 2166, 104 L.Ed.2d 811, (1989). This test involves considering multiple factors, none of which is determinative, including:

> the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Id.*

■ The factors weigh in petitioner's favor at this stage. On one hand, petitioner alleges that he agreed to write the musical and script "in accordance with" the producer's instructions and had his expenses paid for during his work, which was done abroad. On the other hand, petitioner alleges also that he was a musician and composer, both skilled occupations; his work was estimated to be for three months; the producer had no right to assign additional work to petitioner; petitioner's payment was a percentage of the revenue to be gotten from the total work; petitioner did not appear to receive any special benefits or employee-like tax treatment from the agreement. On the basis of petitioner's allegations, it appears that petitioner did not prepare the songs and screenplay as an employee, but rather as a commissioned contractor. *Id.* (Sculptor hired to prepare statute not "employee" in spite of hiring party's control over details of product because sculptor was in skilled occupation, using his own tools, retained for less than two months, his pay was dependent on completion of specific job, and he could not be assigned additional work at will of hiring party). Therefore, at this stage I cannot conclude that petitioner was an "employee" of the producer or performing commissioned work that could be considered "work made for hire" under 17 U.S.C. § 101. For the sake of screening his complaint, petitioner will be considered the "author" of the 13 songs found in The Apple movie and "coauthor" of the screenplay and initial "ownership" of those works will be considered to have vested in petitioner under 17 U.S.C. 201(a).

### 2. Transfer of ownership

■ "By contract the sole creator of a work can transfer 'authorship' in whole or part to another." *Seshadri v. Kasraian,* 130 F.3d 798 (7th Cir.1997) (citing *Childress v. Taylor,* 945 F.2d 500 (2d. Cir. 1991)). Viewing the facts in the light most favorable to petitioner, as is required at this stage of the proceedings, the agreement signed by petitioner stated that he was "selling and transferring ... all the

copyrights of any type and kind to the musical including but not limited to the publishing rights to the musical ... for the purpose of producing plays and/or records and/or movies and/or production in any extent in accordance with the foregoing musical." (Although the sentence makes less sense reading it as petitioner claims it should be translated, the issue boils down to the proper translation of the original Hebrew agreement, an issue I cannot address at the screening stage.) The agreement indicates that the producer owned the copyrights to the Hebrew musical and intended to adapt the musical to plays, records or movies. This language indicates no more than that petitioner granted the producer the exclusive right to "prepare" certain "derivative works" based on the Hebrew musical under 17 U.S.C. 106(2). The agreement did not transfer ownership to any copyrights in the new songs and screenplay petitioner created for The Apple movie; such copyrights did not exist at the time of the agreement, and a copyright licensing agreement can assign only preexisting copyrights. *Video Views, Inc. v. Studio 21 Ltd.*, 925 F.2d 1010, 1021 (7th Cir.1991) (abrogated on other grounds by *Budget Cinema v. Watertower Assocs.*, 81 F.3d 729 (7th Cir.1996)).

■ From the allegations found in the complaint, I conclude that petitioner's agreement did not transfer ownership to his copyrights in the 13 songs and screenplay for The Apple movie. Therefore, as the "author" of those works, petitioner continues to be the "owner" of the copyrights in the 13 songs found in The Apple movie and "co-owner" in the copyrights in the screenplay for The Apple movie. Because respondent has "copied" constituent elements of those works by engaging in the assorted acts alleged in counts I–VII of petitioner's complaint, petitioner will be granted leave to proceed on his seven claims of copyright infringement.

## B. Breach of Contract

■ Next, petitioner asserts a claim for breach of contract, alleging that respondent is collecting publishing royalties on sales of The Apple DVD, when the agreement signed by petitioner and respondent's predecessor in interest allows respondent to collect no more than 50% of the publisher's share. (To the extent petitioner also believes that "the collection of royalties" could be a separate cause of action for copyright infringement, he is wrong; collection of royalties is not a form of "copying.") Because the facts could ultimately show that petitioner's copyright infringement claims cannot prevail either because the work was "made for hire" or because he transferred ownership in his right to the work, petitioner is entitled to assert his breach of contract claim in the alternative. The contract allows the producer only "50% of the performing rights and 50% of the mechanical rights." Therefore, petitioner may proceed on his claim that respondent, successor in interest to "the Company" described in the agreement, has breached the agreement by collecting 100% of the publishing rights.

## C. Requirement to Serve Notice on Coauthor

■ One final issue remains. Under 17 U.S.C. § 501(b), a court must require written notice of the action with a copy of the complaint to be served upon "any person shown, by the records of the Copyright Office or otherwise, to have or claim an interest in the copyright ... whose interest is likely to be affected by a decision in the case." Moreover, if the interested third party seeks intervention, the court shall permit it. In his complaint, petitioner has shown that Menachem Golan is the coauthor and therefore presumptive "co-owner" of the screenplay; a decision in this case on the merits of petitioner's copy-

rights would likely affect Golan's copyright ownership interest in the screenplay. Therefore, I will require petitioner to serve notice upon Golan and file proof of such service by July 15, 2008.

## ORDER

IT IS ORDERED that

1. Petitioner Coby Recht's request for leave to proceed in *forma* pauperis is GRANTED with respect to his claims that respondent is infringing his copyrights by directly or indirectly reproducing, adapting or distributing his songs and screenplay from the movie called "The Apple."

2. Petitioner is required to serve written notice of the action with a copy of the complaint upon Menachem Golan in accordance with 17 U.S.C. § 501(b) and file proof of such service by July 15, 2008. Failure to do so may result in dismissal of the action.